Filed 9/25/14  Studendorff v. National Semiconductor CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CHRISTOPHER STUDENDORFF, et al., | H037739 |
| Plaintiffs and Appellants, | (Santa Clara County Super. Ct. No. 110CV178254) |
| v. | |
| NATIONAL SEMICONDUCTOR CORPORATION, | |
| Defendant and Respondent. | |

In this case, we consider questions regarding the statute of limitations for and delayed discovery of pre-birth injuries that were allegedly due to exposure to toxic and hazardous materials that occurred more than 20 years ago.  Debbie Studendorff and her husband, Michael Studendorff, worked for defendant National Semiconductor Corporation (NSC) from the late 1970's until the late 1980's assembling semiconductor products.  The plaintiffs are Debbie Studendorff and Christopher Studendorff, Debbie and Michael Studendorff's son.  Michael Studendorff is not a plaintiff.  (For clarity, and meaning no disrespect, we will hereafter refer to the members of the Studendorff family individually by their first names.  We will refer to Debbie, Michael, and Christopher collectively as "the Studendorffs," to Debbie and Christopher jointly as "Plaintiffs," and sometimes to Debbie and Michael jointly as "Parents.")

Plaintiffs allege that Christopher was born with retinoblastoma (a cancer of the eye) and other birth defects as a result of parental and *in utero* exposure to hazardous and toxic chemicals while Debbie and Michael worked in NSC's "clean rooms." Plaintiffs further allege that Parents did not know Christopher's birth defects were caused by workplace exposure to hazardous chemicals until December 2008, when they heard on the radio that their attorneys were investigating cases of birth defects caused by chemical exposures in the semiconductor industry. But Plaintiffs also allege that around the time Christopher was diagnosed with retinoblastoma in October 1987, Parents asked NSC "whether they had worked with or otherwise been exposed to any hazardous chemicals."

Plaintiffs appeal from a judgment of dismissal after the trial court sustained NSC's demurrer to Plaintiffs' second amended complaint without leave to amend on statute of limitations grounds. The court concluded that the action was barred by the statute of limitations in Code of Civil Procedure section 340.4, or its predecessor, former Civil Code section 29, both of which apply to actions based on birth and pre-birth injuries. (Unless otherwise stated, all further statutory references are to the Code of Civil Procedure.)

Plaintiffs contend the applicable statute of limitations is section 340.8, the two-year limitations period for causes of action based on exposure to hazardous chemicals (which they contend is subject to tolling for minority and insanity), and that the trial court erred when it applied section 340.4, the six-year limitations period for causes of action based on pre-birth injuries (which is not subject to such tolling). Plaintiffs also argue that: (1) the court erred when it concluded they were not entitled to rely on the discovery rule to toll the statute of limitations; (2) NSC is equitably estopped from relying on a statute of limitations defense because it knew the chemicals used in the workplace caused reproductive harm and NSC fraudulently concealed the causal connection between plaintiffs' chemical exposure and their injuries; and (3) if the allegations of the second

amended complaint are insufficient, they can amend their pleading to adequately allege delayed discovery and equitable estoppel based on NSC's fraudulent concealment.

We conclude that (1) the applicable limitations period is the six-year period in former Civil Code section 29; (2) Plaintiffs have not pleaded sufficient facts to support their claim of delayed discovery; and (3) the allegations of the complaint are insufficient to support an equitable estoppel claim. Furthermore, since Plaintiffs' proposed amendments do not cure the deficiencies in their pleading, the trial court did not abuse its discretion when it sustained the demurrer without leave to amend or when it denied leave to amend to allege an equitable estoppel claim. We will therefore affirm the judgment of dismissal.

## FACTS[1]

Christopher was born on August 27, 1987; he was 22 years old when the original complaint was filed. Christopher is developmentally disabled; he is represented in this action by and through his father and conservator, Michael Studendorff.[2]

---

[1] In reviewing the propriety of the trial court's order sustaining NSC's demurrer, we accept as true all factual allegations properly pleaded in the complaint. (*Gu v. BMW of North America, LLC* (2005) 132 Cal.App.4th 195, 200.) Accordingly, our summary of the facts is drawn from the material allegations of the operative pleading, the second amended complaint. (*Ibid.*) And since a demurrer admits the truth of all facts properly pleaded, we will refer to the allegations of the second amended complaint in this paragraph and in succeeding paragraphs without sometimes using the prefatory phrase "plaintiffs allege," to avoid undue repetition of the phrase.

[2] Although Michael was named as a plaintiff in the original and first amended complaints, he is not a plaintiff in the second amended complaint. It appears Michael elected not to pursue his own claims so he could serve as Christopher's guardian ad litem. In March 2010, the court denied Michael's request to serve as Christopher's guardian ad litem without prejudice, on the ground that "a co-plaintiff is an inappropriate guardian due to potential conflicts of interest." In May 2010, after Michael filed a request for dismissal of his own claims, the court granted his application to be Christopher's guardian ad litem.

3

Both Debbie and Michael worked for NSC at its Santa Clara manufacturing facility. Debbie worked there from 1977 until 1987; Michael worked there from 1979 until 1989. While working in "clean rooms" at NSC, Parents were "required . . . to use numerous chemicals that are known to be hazardous, teratogenic,[3] genotoxic[4] and reproductively toxic" to assemble and to manufacture NSC's products. "These chemicals are known to cause severe harm to unborn children."

Debbie worked in NSC's clean rooms while she was pregnant with Christopher. During Debbie's pregnancy, Christopher was " 'present' " in the clean rooms and was exposed *in utero*, "during the crucial months of growth in his mother's womb, for prolonged periods of time to teratogenic, genotoxic, and reproductively toxic chemicals and processes." The " 'clean rooms' " were only clean for NSC's products, not its employees. There was no ventilation system to protect workers from inhaling fumes emitted by the chemicals, which remained in the re-circulated air in the clean rooms. The protective clothing the employees wore protected NSC's products from the workers and their clothing, but it did not protect the workers from the chemicals. Parents absorbed the chemicals used in the workplace into their bodies through their skin and by inhalation.

"Upon information and belief," the second amended complaint lists chemicals or classes of chemicals Parents were exposed to and specifies how NSC used some of those chemicals. The exposure to these chemical substances alone or in combination caused Christopher to develop retinoblastoma, a pediatric cancer of the eye, and other birth defects. Parents were exposed to other chemicals and processes, the "exact description, trade name, formulation and other specific identifying information" of which NSC is in a

---

[3] "Teratogenic" means "tending to cause developmental malformations . . . ." (Webster's 3d New Internat. Dict. (1993) p. 2358, col. 1.)

[4] "Genotoxic" means "[d]enoting a substance that by damaging DNA may cause mutation or cancer." (PDR Medical Dictionary (2d ed. 2000) p. 739, col. 1.)

4

"superior position to identify" because it "purchased, manufactured or otherwise acquired same."

Plaintiffs allege NSC "knew or should have known of the hazardous nature of the . . . chemicals and processes used in the 'clean rooms' " and should have foreseen or anticipated that NSC workers would be exposed to those chemicals. NSC "concealed and/or misrepresented the . . . toxic nature of chemicals used in the manufacture of its products," and "failed to warn . . . its employees" of the toxic nature of the chemicals used. Parents "reasonably and justifiably relied on their employer" "to appropriately warn, advise and/or implement safety policies and procedures" pertaining to chemicals in the workplace and as a "direct and proximate result of [NSC's] concealment and failure to warn," they "were prevented from discovering the cause of . . . Christopher's retinoblastoma and other injuries."

Christopher was diagnosed with retinoblastoma "in or about October 1987" (two months or less after his birth). Parents spoke with Christopher's "treating physicians, surgeons and other specialists" regarding his condition "continuously throughout the course of his medical treatment and care." "At no time prior to December 2008, did any" of the medical professionals treating Christopher "ever inform, advise, suggest or otherwise imply that parental occupational exposure was a potential contributing cause of" Christopher's injuries and birth defects. Parents therefore had "no reason to investigate, inquire into or suspect any occupational cause of these injuries."

But around the time Christopher was diagnosed with retinoblastoma in October 1987, Parents asked NSC "whether they had worked with or otherwise been exposed to any hazardous chemicals. Specifically, Debbie . . . contacted the [NSC] human resources department, which in turn referred her to other departments." In response, NSC "actively concealed and by omission failed to provide information to" Parents, and it thus "engaged in a willful subterfuge, purporting to respond to the inquiry while in fact actively concealing, and failing and refusing to provide, any information regarding the nature or

5

potential health hazards of the chemicals and processes used in its manufacturing facilities or to admit that it was in possession of any knowledge or information regarding such hazards." NSC "expressly and impliedly represented to [Parents] . . . that the chemicals and substances present in their work areas and at their place of employment did not pose a hazard to [Parents] or their unborn children." Parents "reasonably relied upon such representations."

Twenty-one years later, "[i]n or after December 2008," Parents "heard attorney radio advertisements [that] informed them that certain attorneys . . . were investigating cases of birth defects caused by chemical exposures in the semiconductor industry." Parents responded to the ads and retained counsel to investigate whether Christopher's retinoblastoma and other birth defects "were caused by parental occupational exposure" to toxic chemicals at NSC. Through that investigation, "they learned for the first time, in or after December 2008," that Christopher's injuries were caused by chemical exposures at NSC. "[A]t no time prior to retaining counsel," did Parents suspect that Christopher's injuries were caused by chemical exposures at NSC.

## PROCEDURAL HISTORY

### Appointment of Parents as Conservators for Christopher

Before filing this action, Parents filed a petition for a limited conservatorship to be appointed conservators of the person for Christopher. The petition alleged that Christopher "is developmentally disabled. While he can groom himself and cook simple meals, he is unable to manage money, has no concept of time, and his judgment is impaired. He functions at about a 3rd grade level." Christopher lived at the DEMY Home in Livermore. His parents and two siblings resided in Pleasanton. The court granted the petition and appointed both Debbie and Michael to serve as Christopher's conservators.

6

The operative pleading does not expressly allege that exposure to toxic chemicals at NSC caused Christopher's developmental disability; it is not clear whether Christopher's developmental disability is one of the other "birth defects" that Plaintiffs claim were caused by exposure to chemicals at NSC.

### *Initial Pleadings and Demurrer to First Amended Complaint*

The Studendorffs filed their original complaint against NSC on February 22, 2010, in Alameda County Superior Court. In addition to Michael, Debbie, and Christopher, the named plaintiffs included Megan Ovick (who also had retinoblastoma) and her parents, Marla Ovick and Michael Ovick (both of whom also worked at NSC). The Ovicks' claims are the subject of a separate appeal in *Ovick v. National Semiconductor* (Sept. 25, 2014, H038108, nonpub. opn.).

In May 2010, the parties stipulated to a change of venue from Alameda County to Santa Clara County and the court ordered the matter transferred.

In September 2010, after NSC filed a demurrer to the original complaint, but before the hearing on the demurrer, Plaintiffs filed a first amended complaint. The first amended complaint included causes of action on behalf of Christopher for negligence, strict liability, willful misconduct, misrepresentation, premises liability, and products liability. The first amended complaint also included causes of action on behalf of Debbie for intentional and negligent infliction of emotional distress.

NSC demurred to the first amended complaint on a variety of grounds, including that it was barred by the statute of limitations. Plaintiffs filed opposition to the demurrer.

In November 2010, the court sustained the demurrer with leave to amend based on the statute of limitations defense. The court found that the action was governed by section 340.4, and its predecessor, former Civil Code section 29, which were subject to the discovery rule. Citing *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 808 (*Fox*), the court held that "Plaintiffs had failed to *specifically* 'plead facts to show (1) the

7

time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence.' " (Original italics.)

***Second Amended Complaint and Demurrer to Second Amended Complaint***

Plaintiffs filed their second amended complaint in December 2010. It contained the same causes of action as their first amended complaint.

NSC demurred to the second amended complaint. NSC argued, among other things, that Plaintiffs' claims were barred by the statute of limitations in section 340.4 and that Plaintiffs had failed to specifically plead facts that warranted application of the discovery rule. NSC argued that Christopher's causes of action accrued in October 1987, when Parents asked NSC whether they had been exposed to any hazardous chemicals, and that because they suspected a causal link in 1987, they were required to conduct a reasonable investigation at that time.

Plaintiffs opposed the demurrer, arguing that the applicable statute of limitations was the two-year period in section 340.8, which governs actions based on exposure to toxic substances, and that the limitations period had not yet expired when the original complaint was filed because it was tolled by Christopher's intellectual disability. They also argued that their claims were timely under both sections 340.4 and 340.8 because they were tolled by the discovery rule. Plaintiffs argued that Parents undertook a reasonable investigation when they consulted Christopher's physicians and "relied on the misinformation and false assurances of [NSC]" and that through no fault of their own, they did not discover facts essential to Plaintiffs' claims until December 2008. Plaintiffs also requested leave to amend.

In its order on the demurrer, the court affirmed its previous holding that the applicable limitations period is the six-year period in section 340.4 or former Civil Code section 29 for pre-birth injuries. As to the Studendorffs, the trial court sustained the demurrer without leave to amend finding that the entire complaint was barred by section

8

340.4, which is not subject to tolling for minority or insanity (§ 352). The court held that although section 340.4 is subject to the discovery rule, the limitations period was not tolled by delayed discovery because Parents actually suspected wrongdoing in October 1987, and Plaintiffs "clearly fail[ed] to demonstrate that despite diligent investigation of the circumstances of injury, [Parents] could not have reasonably discovered facts supporting the cause of action within the applicable . . . limitations period." The court did not make an express ruling regarding Debbie's emotional distress claims (§ 335.1), but it sustained the demurrers without leave to amend as to the entire complaint. As to the Ovicks, the court sustained the demurrer to their claims with leave to amend and made other rulings that are not relevant to this appeal.

*Motion for Reconsideration*

In June 2011, Plaintiffs filed a motion for reconsideration of the court's order on the demurrer. They asserted that after the court granted the Ovicks leave to amend, their counsel "undertook an extensive examination of all available facts . . . to satisfy the heightened pleading standard," which included documents that were not readily available when the second amended complaint was filed. They argued that counsel's review had uncovered "several new and different facts pertinent to the cause of action for misrepresentation," which also tolled the statute of limitations "on the basis of fraudulent concealment." Plaintiffs attached a proposed third amended complaint that contained 40 to 50 paragraphs of additional allegations relating to NSC's alleged knowledge and concealment.

The proposed third amended complaint alleged that NSC was a founding member of the Semiconductor Industry Association (SIA) and participated in the Semiconductor Safety Association (SESHA). It alleged that before 1982, SIA told NSC that animal studies had revealed that the chemicals used in the semiconductor industry caused birth defects. And before 1987, a SESHA journal advised NSC that: (1) at least 18 chemicals

9

used to manufacture semiconductors were known to cause birth defects in animals; (2) at least 15 such chemicals were known to cause birth defects in humans; (3) extreme caution should be used with these chemicals; and (3) employers should discuss known risks of reproductive harm with their female employees. By 1987, NSC knew that an epidemiologic study of Digital Equipment Corporation (DEC) workers documented an increased risk of miscarriage among fabrication workers in the semiconductor industry.

To support allegations of concealment, the proposed third amended complaint described statements by the SIA in a 1980 newspaper article, a 1987 white paper, testimony before Congress in 1989, as well as comments by NSC employees in two newspaper articles in 2000 that the semiconductor industry was safe. The pleading also described an SIA-funded study done by the University of California at Davis in the late 1980's relating to miscarriages and fertility in the semiconductor industry, as well as a "script" developed by the SIA for sharing the study's results with industry workers. The proposed third amended complaint alleged misrepresentation and concealment because that SIA-funded study did not explore birth defects and developmental damage (as opposed to miscarriages and fertility) and because the "script affirmatively advised employees that semiconductor fabs were 'a safe place for women of child-bearing age to work' " in terms of miscarriage rates. Because employee "debriefing sessions" by the industry "took great pains to avoid and deflect" any discussion of birth defects, they left the impression that miscarriages, but not birth defects, were a problem.

The proposed third amended complaint went on to allege that "by at least 1987," NSC and the SIA "knew of multiple . . . studies involving the reproductive effects of manufacturing chemicals, the results of which were summarized in detail and distributed by the Semiconductor Safety Association." Notwithstanding this knowledge, NSC's 1995 Chemical and Radiation Safety Handbook contained no information pertaining to reproductive harm or pregnancy and NSC's employee hazard training in the 1980's and

10

1990's was silent regarding the potential for reproductive harm from work in the semiconductor industry.

NSC opposed the motion for reconsideration on a number of grounds, including that Plaintiffs had not explained why they could not have discovered this information sooner, that the statements were made by third parties who were not defendants, that Plaintiffs had not alleged that Parents heard or relied on any of the facts set forth in the third amended complaint, and that the "new facts" did not justify Parents' failure to investigate.

The court denied the motion for reconsideration. On November 1, 2011, the court entered a judgment of dismissal as to Plaintiffs.

## DISCUSSION

### I. Standard of Review

We perform an independent review of a ruling on a demurrer and decide de novo whether the challenged pleading states facts sufficient to constitute a cause of action. (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42; *McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*); see also *Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1075.) In addition to accepting as true all properly pleaded material

11

facts, we also accept as true those facts that may be implied or inferred from facts expressly alleged. (*City of Morgan Hill v. Bay Area Air Quality Management Dist.* (2004) 118 Cal.App.4th 861, 869-870.)

"It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct. A demurrer tests only the legal sufficiency of the pleading." (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 213.) Thus, as noted, "the facts alleged in the pleading are deemed to be true, however improbable they may be. [Citation.]" (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604; see also *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [court reviewing propriety of ruling on demurrer is not concerned with the "plaintiff's ability to prove . . . allegations, or the possible difficulty in making such proof"].)

On appeal, we will affirm a "trial court's decision to sustain the demurrer [if it] was correct on any theory. [Citation.]" (*Kennedy v. Baxter Healthcare Corp.* (1996) 43 Cal.App.4th 799, 808, fn. omitted.) Thus, "we do not review the validity of the trial court's reasoning but only the propriety of the ruling itself. [Citations.]" (*Orange Unified School Dist. v. Rancho Santiago Community College Dist.* (1997) 54 Cal.App.4th 750, 757.)

## II.  *Statute of Limitations for Christopher's Claims*

Plaintiffs contend the court erred when it held that the applicable statute of limitations is the six-year limitations period in section 340.4, which applies to personal injury claims based on birth and pre-birth injuries. They assert that the applicable statute of limitations is the two-year limitations period in section 340.8, which applies to injury claims "based upon exposure to a hazardous material or toxic substance." (§ 340.8) Plaintiffs argue that both statutes "appear to govern an action for birth or pre-birth injuries caused by exposure to hazardous materials or toxic substances" and that section

12

340.8, the later-enacted, more specific statute, controls over the earlier-enacted, more general provision in section 340.4.

## A. General Principles Regarding Statutes of Limitations

As the Supreme Court explained in *Pooshs v. Phillip Morris USA, Inc.* (2011) 51 Cal.4th 788 (*Pooshs*), a "statute of limitations strikes a balance among conflicting interests. If it is unfair to bar a plaintiff from recovering on a meritorious claim, it is also unfair to require a defendant to defend against possibly false allegations concerning long-forgotten events, when important evidence may no longer be available. Thus, statutes of limitations are not mere technical defenses, allowing wrongdoers to avoid accountability. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 395-397 . . . [(*Norgart*)].) Rather, they mark the point where, in the judgment of the Legislature, the equities tip in favor of the defendant (who may be innocent of wrongdoing) and against the plaintiff (who failed to take prompt action): '[T]he period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones.' " (*Pooshs*, at p. 797, quoting *Johnson v. Railway Express Agency* (1975) 421 U.S. 454, 463-464.)

"There are several policies underlying such statutes. One purpose is to give defendants reasonable repose, thereby protecting parties from 'defending stale claims, where factual obscurity through the loss of time, memory or supporting documentation may present unfair handicaps.' [Citations.] A statute of limitations also stimulates plaintiffs to pursue their claims diligently. [Citations.] A countervailing factor, of course, is the policy favoring disposition of cases on the merits rather than on procedural grounds." (*Fox*, *supra*, 35 Cal.4th 797, 806.) Statutes of limitations are " 'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.' " (*Adams v. Paul* (1995) 11 Cal.4th 583, 592.) Once the statute of

13

limitations runs, " 'the right to be free of stale claims . . . comes to prevail over the right to prosecute them.' " (*Ibid*.)

"Critical to applying a statute of limitations is determining the point when the limitations period begins to run.  Generally, a plaintiff must file suit within a designated period after the cause of action *accrues*.  (. . . § 312.)  A cause of action accrues 'when [it] is complete with all of its elements'—those elements being wrongdoing, harm, and causation."  (*Pooshs*, *supra*, 51 Cal.4th at p. 797, citing *Norgart*, *supra*, 21 Cal.4th at p. 397; original italics.)

"The most important exception to [the] general rule regarding accrual of a cause of action is the 'discovery rule,' under which accrual is postponed until the plaintiff 'discovers, or has reason to discover, the cause of action.'  [Citation.]  Discovery of the cause of action occurs when the plaintiff 'has reason . . . to suspect a factual basis' for the action."[5]  (*Pooshs*, *supra*, 51 Cal.4th at p. 797, citing *Norgart*, *supra*, 21 Cal.4th at pp. 397, 398 and *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110-1111 (*Jolly*).) " 'The policy reason behind the discovery rule is to ameliorate a harsh rule that would allow the limitations period for filing suit to expire before a plaintiff has or should have learned of the latent injury and its cause.' "  (*Pooshs*, at pp. 797-798, quoting *Buttram v. Owens-Corning Fiberglas Corp*. (1997) 16 Cal.4th 520, 531.)  When the plaintiff is a minor, it is the knowledge or lack thereof of the parents that determines when the cause of action accrues.  (*Young v. Haines* (1986) 41 Cal.3d 883, 890, fn. 4 (*Young*).)

The statutes of limitations at issue in this case are section 340.4 and its antecedent, former Civil Code section 29, (both of which apply to pre-birth and birth injuries) and section 340.8 (which applies to injuries due to exposure to hazardous materials or toxic substances).  For clarity and ease of reference, we will sometimes use the parentheticals

---

[5]  The discovery rule is also referred to in the case law and the parties' briefs as the "delayed discovery rule."  (See e.g., *Fox*, *supra*, 35 Cal.4th at p. 803.)  For ease of reference, we shall use the term "discovery rule."

"(pre-birth injuries)" after references to former Civil Code section 29 and section 340.4 and "(toxic exposures)" after references to section 340.8.

## B. Former Civil Code Section 29 (Statute of Limitations for Pre-Birth Injuries Until 1993)

Former Civil Code section 29 provided: "A child conceived, but not yet born, is to be deemed an existing person, so far as may be necessary for its interests in the event of its subsequent birth; but any action by or on behalf of a minor for personal injuries sustained prior to or in the course of his birth must be brought within six years from the date of the birth of the minor, and the time such minor is under any disability mentioned in Section 352 of the Code of Civil Procedure shall not be excluded in computing the time limited for the commencement of the action." Section 352, in turn, provides in relevant part: "(a) If a person entitled to bring an action, mentioned in Chapter 3 (commencing with Section 335)[6] is, at the time the cause of action accrued either under the age of majority or insane, the time of the disability is not part of the time limited for the commencement of the action." Thus, under the plain language of former Civil Code section 29, an action for pre-birth and birth injuries is not tolled by the child's minority or insanity.

The second clause of former Civil Code section 29, which sets forth the statute of limitations, was added in 1941 and became effective on January 1, 1942. (Stats. 1941, ch. 337, § 1; Cal. Const., art. IV, § 8, subd. (c); *People v. Verba* (2012) 210 Cal.App.4th 991, 997 ["with some exceptions, statutes enacted by the Legislature in one year take effect on January 1 of the following year"].) Former Civil Code section 29 was subject to the discovery rule. (*Young*, *supra*, 41 Cal.3d at pp. 892-893.) The statute

---

[6] The reference to "Chapter 3" in section 352 is to chapter 3 (civil actions other than for the recovery of real property) of title 2 (the time of commencing civil actions) of part 2 (civil actions) of the Code of Civil Procedure. Chapter 3 includes sections 335 through 349¾.

was never amended after 1941 and was repealed in 1993. (Stats. 1993, ch. 219, § 2; see Historical and Statutory Notes, 6 West's Ann. Civil Code (2006 ed.) foll. § 29, p. 90.)

### C. Section 340.4 (Statute of Limitations for Pre-Birth Injuries Since 1994)

Section 340.4 provides: "An action by or on behalf of a minor for personal injuries sustained before or in the course of his or her birth must be commenced within six years after the date of birth, and the time the minor is under any disability mentioned in Section 352 shall not be excluded in computing the time limited for the commencement of the action."

Section 340.4 was enacted in 1992; it became operative on January 1, 1994. (Stats. 1992, ch. 163 §§ 16, 161.) Section 340.4 contains language very similar to that of the second clause of former Civil Code section 29. (Stats. 1941, ch. 337, § 1.) Section 340.4 is " 'but a continuation of' " the second clause of former Civil Code section 29. (*In re White* (2008) 163 Cal.App.4th 1576, 1582, citing *Sekt v. Justice's Court* (1945) 26 Cal.2d 297, 306.) Like its predecessor, under the plain language of section 340.4, an action for personal injuries sustained before or at the time of birth is not tolled by the child's minority or insanity, but the limitations period is subject to the discovery rule. (*Young*, *supra*, 41 Cal.3d at pp. 892-893 [former Civil Code section 29].).

### D. Section 340.8 (Statute of Limitations for Exposure to Toxic Substances)

Section 340.8 provides in relevant part: "(a) In any civil action for injury or illness based upon exposure to a hazardous material or toxic substance, the time for commencement of the action shall be no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later. [¶] [¶] (c) For

16

purposes of this section:  [¶]  (1) A 'civil action for injury or illness based upon exposure to a hazardous material or toxic substance' does not include an action subject to Section 340.2 [(limitations period for actions based upon exposure to asbestos)] or 340.5 [(limitations period for actions based on professional negligence of a health care provider)].  [¶]  (2) Media reports regarding the hazardous material or toxic substance contamination do not, in and of themselves, constitute sufficient facts to put a reasonable person on inquiry notice that the injury or death was caused or contributed to by the wrongful act of another.  [¶]  (d) Nothing in this section shall be construed to limit, abrogate, or change the law in effect on the effective date of this section with respect to actions not based upon exposure to a hazardous material or toxic substance."

Section 340.8, signed into law by the Governor in October 2003, became effective on January 1, 2004.  (Stats. 2003, ch. 873, p. 6398; Cal. Const., art. IV, § 8, subd. (c).)

**E.  Section 352 Tolling for Minority and Insanity Applies to Section 340.8**

Unlike section 340.4 and former Civil Code section 29, which expressly state that section 352 tolling for minority and insanity does not apply to actions for pre-birth and birth injuries, section 340.8 is silent regarding section 352 tolling.  By its own terms, section 352 applies only to civil actions that are mentioned in chapter 3 of title 2 of part 2 of the Code of Civil Procedure (§§ 335 through 349¾).  Since section 340.8 is in chapter 3 and section 340.8 does not expressly exclude section 352 tolling, the tolling provision in section 352 for minority and insanity applies to section 340.8.

In summary, the six-year limitations period in former Civil Code section 29 governed pre-birth and birth injuries from 1942 through its repeal on December 31, 1993. In 1992, the Legislature updated the language of the limitations provision in former Civil Code section 29 and moved it from the Civil Code to the Code of Civil Procedure when it enacted section 340.4, without making any substantive change.  Section 340.4 (pre-birth injuries) became operative on January 1, 1994.  In 2003, the Legislature added section

17

340.8, the statute of limitations for causes of action based on exposure to hazardous materials and toxic substances, effective January 1, 2004.

## F. Analysis

The operative pleading alleges three possible accrual dates for Christopher's injuries: (1) August 27, 1987 (his date of birth), (2) October 1987 (when Parents asked NSC about possible chemical exposures), and (3) December 2008 (when Parents learned that their attorneys were investigating cases involving birth defects due to chemical exposures in the semiconductor industry). We will examine each of these accrual dates as they relate to the statutes of limitations at issue to determine whether there is any possible analysis under which Christopher's claims might be timely.

### 1. Assuming accrual on Christopher's birth date (August 27, 1987), Plaintiffs' claims are time-barred under former Civil Code Section 29

When Christopher was born on August 27, 1987, the limitations period in former Civil Code section 29 governed actions for pre-birth injuries; section 340.8 (toxic exposures) had not yet been enacted. Under former Civil Code section 29, Christopher was required to bring his claims for pre-birth injuries no later than six years from his birth, or by August 27, 1993. This limitations period was not tolled by his minority or developmental disability. Thus, assuming Christopher's claims accrued on his date of birth, the original complaint, filed in February 2010, was untimely by more than 16 years.

### 2. Assuming delayed accrual until October 1987, Plaintiffs' claims are time-barred under former Civil Code section 29

Assuming delayed accrual under the discovery rule and that Christopher's causes of action accrued when his parents made inquiries regarding the cause of his birth defects around the time of his diagnosis in October 1987, former Civil Code section 29 still applied. Under that section, Christopher was required to file suit within six years of

18

discovery, or no later than October 1993. Under this analysis, his complaint, filed in February 2010, was still untimely by more than 16 years.

### 3. *Assuming delayed accrual until December 2008, Plaintiffs' claims would be timely under sections 340.4 and 340.8*

Assuming delayed discovery and that Christopher's causes of action accrued in December 2008 when Parents heard the attorneys' radio advertisements, the applicable statute of limitations for pre-birth and birth injuries was section 340.4. Under section 340.4, Christopher was required to file suit within six years of discovery, or no later than December 2014. But by December 2008, section 340.8 (toxic exposures) was also operative. Under section 340.8, Christopher was required to file suit within two years of discovery, or no later than December 2010. If the accrual of Christopher's causes of action was delayed until December 2008, then his complaint, filed in February 2010, was timely under both section 340.4 (pre-birth injuries) and section 340.8 (toxic exposures).

But the statutes at issue were not in effect when Christopher was born or when he was diagnosed. Plaintiffs argue that because section 340.8 (toxic exposures) did not become operative until January 1, 2004, "it will apply to Christopher's claims only if they were not already time-barred under section 340.4 when section 340.8 became operative."

"Statutes generally operate only prospectively, and '[a] new statute that enlarges a statutory limitations period [only] applies to actions that are not already barred by the original limitations period at the time the new statute goes into effect.' (*Andonagui v. May Dept. Stores Co*. (2005) 128 Cal.App.4th 435, 440 . . . [(*Andonagui*)].) To revive an expired claim, a new statute of limitations must be made expressly retroactive by the Legislature, . . . . (*Andonagui*, at p. 440; . . . .) 'The reason for this rule is a judicial perception of unfairness in reviving a cause after the prospective defendant has assumed its expiration and has conducted his affairs accordingly.' [Citations.]" (*Aguilera v. Heiman* (2009) 174 Cal.App.4th 590, 596.)

19

Neither section 340.4 nor section 340.8 contains language that makes it expressly retroactive. Section 340.4 applies only if Christopher's claims were not already time-barred when it became operative on January 1, 1994, and section 340.8 applies only if Christopher's claims were not already time barred on its effective date, January 1, 2004. Assuming Christopher's causes of action accrued when he was born in August 1987, or when his parents made inquiry of NSC in October 1987, under former Civil Code section 29, he was required to bring suit no later than August 1993 or October 1993. Thus, Christopher's claims were already time barred when sections 340.4 and 340.8 went into effect.

The only way Christopher's claims survive is if he has adequately pleaded delayed accrual until December 2008 under the discovery rule. If that is the case, Christopher's action would be timely under both section 340.4 and section 340.8, without having to consider tolling for minority or insanity.

### 4. *Plaintiffs' claims are time-barred because they accrued in October 1987*

If Plaintiffs' claims had accrued in December 2008, they would have been timely under both sections 340.4 and 340.8. But as we will explain, the allegations of the second amended complaint show that the claims accrued in October 1987. Therefore, they were time barred under former Civil Code section 29.

### III. *Delayed Accrual Under the Discovery Rule*

#### A. Legal Principles

"The discovery rule provides that the accrual date of a cause of action is delayed until the plaintiff is aware of her [or his] injury and its negligent cause. [Citation.] A plaintiff is held to her [or his] actual knowledge as well as knowledge that could reasonably be discovered through investigation of sources open to her [or him]." (*Jolly*,

*supra*, 44 Cal.3d at p. 1109, footnote omitted.) "Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her [or his] injury was caused by wrongdoing, that someone has done something wrong to her [or to him]." (*Id.* at p. 1110.) In other words, "the limitations period begins once the plaintiff 'has notice or information of circumstances to put a reasonable person *on inquiry*.' " (*Id.* at pp. 1110-1111, original italics, internal quotations omitted.) "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she [or he] must decide whether to file suit or sit on her [or his] rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she [or he] cannot wait for the facts to find her [or him]." (*Id.* at p. 1111.)

*Jolly* "sets forth two alternate tests for triggering the limitations period: (1) a subjective test requiring actual suspicion by the plaintiff that the injury was caused by wrongdoing; and (2) an objective test requiring a showing that a reasonable person would have suspected the injury was caused by wrongdoing. [Citation.] The first to occur under these two tests begins the limitations period." (*Kitzig v. Nordquist* (2000) 81 Cal.App.4th 1384, 1391, citing *Jolly*, *supra*, 44 Cal.3d at p. 1110.)

" '[O]nce properly pleaded, belated discovery is a question of fact.' [Citation.] . . . 'There are no hard and fast rules for determining what facts or circumstances will compel inquiry by the injured party and render him chargeable with knowledge. [Citation.] . . . 'However, whenever reasonable minds can draw only one conclusion from the evidence, the question becomes one of law.' [Citation.] Thus, when an appeal is taken from a judgment of dismissal following the sustention of a demurrer, 'the issue is whether the trial court could determine as a matter of law that failure to discover was due to failure to investigate or to act without diligence.' " (*E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1320 (*E-Fab*).)

*Jolly* used *Miller v. Bechtel Corp.* (1983) 33 Cal.3d 868 (*Miller*) to illustrate application of the discovery rule. (*Jolly*, *supra*, 44 Cal.3d at p. 1111.) In *Miller*, the California Supreme Court had "held that [the] plaintiff was barred by the statute of limitations from pursuing her suit for fraud, even though she filed suit soon after she discovered facts confirming her long-held suspicion that her former husband had concealed the true worth of his assets during dissolution negotiations. [The *Miller* court] noted that the plaintiff had doubts at the time she signed the dissolution agreement as to the actual value of her husband's Bechtel stock. However, neither she nor her attorney took adequate steps then to investigate the matter. Years later, when the stock was sold for an amount well beyond that stated during the dissolution discussions, [the] plaintiff brought suit. [The Supreme Court] held that her early suspicion put her on inquiry notice of the potential wrongdoing, which an investigation would have confirmed. Her failure timely to investigate barred the action." (*Jolly*, at p. 1111.)

"[B]y discussing the discovery rule in terms of a plaintiff's suspicion of 'elements' of a cause of action, [the Supreme Court] was referring to the 'generic' elements of wrongdoing, causation, and harm." (*Fox*, *supra*, 35 Cal.4th at p. 807.) "In so using the term 'elements,' [the Supreme Court did] not take a hypertechnical approach to the application of the discovery rule. Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, [courts] look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." (*Ibid.*) "The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action. The discovery rule does not encourage dilatory tactics because plaintiffs are charged with presumptive knowledge of an injury if they have ' " 'information of circumstances to put [them] on inquiry' " ' or if they have ' " 'the opportunity to obtain knowledge from sources open to [their] investigation.' " ' [Citations.] In other words, plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information

that would have been revealed by such an investigation." (*Id.* at pp. 807-808.) In this context, "injury" means both a person's physical condition and its negligent cause. (*Id.* at p. 808, fn. 2.) "Thus, physical injury alone is often insufficient to trigger the statute of limitations." (*Ibid.*)

To rely on the discovery rule, " '[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence.' [Citation.] In assessing the sufficiency of the allegations of delayed discovery, the court places the burden on the plaintiff to 'show diligence'; 'conclusory allegations will not withstand demurrer.' " (*Fox*, *supra*, 35 Cal.4th at p. 808.) "Simply put, in order to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury. If such an investigation would have disclosed a factual basis for a cause of action, the statute of limitations begins to run on that cause of action when the investigation would have brought such information to light. In order to adequately allege facts supporting a theory of delayed discovery, the plaintiff must plead that, despite diligent investigation of the circumstances of the injury, he or she could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period." (*Id.* at pp. 808-809.)

The California Supreme Court's application of the discovery rule in *Jolly* and *Norgart* is instructive. The plaintiff in *Jolly* sued Eli Lilly and other drug companies that manufactured the drug estrogen diethylstilbestrol (DES) for personal injuries she sustained as a result of her mother's ingestion of DES while the plaintiff was *in utero*. (*Jolly*, *supra*, 44 Cal.3d at pp. 1107-1108.) Undisputed evidence in *Jolly* showed that "[a]s of 1972, [the] plaintiff was aware or at least suspected" her precancerous condition was a result of her mother's ingestion of DES and attempted to discover the identity of

23

the manufacturer of the DES her mother had taken. (*Id.* at p. 1107.) Several companies manufactured the drug and Jolly was unable to determine which company manufactured the DES her mother took. But "[a]t least as of 1978, [she] was aware of the pendency of one or more DES suits alleging that DES manufacturers were liable to those injured . . . ." (*Id.* at p. 1108.) Jolly filed her complaint in early 1981, almost a year after the California Supreme Court held that a plaintiff who could not identify the manufacturer of the ingested DES could state a cause of action against the manufacturers of a substantial percentage of the market share of the drug. (*Ibid.*, citing *Sindell v. Abbott Laboratories* (1980) 26 Cal.3d 588.) The parties had agreed that the applicable limitations period was the one-year statute of limitations in former section 340, subdivision (3). (*Jolly*, at pp. 1108-1109.) Applying the discovery rule, the court held that Jolly's claims were time barred. The court explained that Jolly had "stated that as early as 1978 she was interested in 'obtaining more information' about DES because she wanted to 'make a claim'; she felt that someone had done something wrong to her concerning DES, that it was a defective drug and that she should be compensated. . . . Thus, plaintiff is held to her admission; she suspected that defendants' conduct was wrongful during 1978—well over a year before she filed suit. This suspicion would not have been allayed by any investigation. To the contrary, a timely investigation would have disclosed numerous articles concerning DES and many DES suits filed throughout the country alleging wrongdoing." (*Jolly*, at pp. 1112-1113.)

In *Norgart*, a wrongful death action, the decedent's parents sued drug manufacturer Upjohn alleging that their daughter, Kristi, had committed suicide by means of an intentional overdose of the prescription drug Halcion. (*Norgart*, *supra*, 21 Cal.4th at p. 390.) The trial court granted summary judgment on statute of limitations grounds. The Supreme Court held that the action, filed six years after Kristi died, was time barred both under the general rule, which required filing within one year of the date of death, (former § 340, subd. (3)) and under the discovery rule. (*Id.* at pp. 393-394.)

24

The court stated that the plaintiffs' causes of action "accrued when they came at least to suspect, or have reason to suspect, a factual basis for their elements, which occurred as early as the date of Kristi's death on October 16, 1985, but no later than . . . mid-1986. Nevertheless, they were not brought until the original complaint was filed on October 16, 1991." (*Id.* at p. 405.) The decedent's father admitted that, " 'around the time of Kristi's death,' " he suspected "that 'something wrong' had happened to her to cause her death." (*Id.* at pp. 405-406.) The court held that the plaintiffs "had reason to discover their causes of action . . . against Upjohn for manufacturing and distributing Halcion soon after Kristi's death" when "they learned of her depression and [prior] suicide attempts, [as well as] her depression and suicide by overdose of prescription drugs, including Halcion, on October 16, 1985. And soon after her death, . . . having undertaken an investigation into its cause, they had reason to learn of a possible connection to Halcion and Upjohn" which "was disclosed by the package insert that the company had prepared for the drug." (*Id.* at p. 407.)

More recently, the California Supreme Court has noted that "California law recognizes a general, rebuttable presumption, that plaintiffs have 'knowledge of the wrongful cause of an injury.' [Citation.] In order to rebut that presumption, ' "[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." ' [Citation.]" (*Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 638 (*Grisham*), quoting *Fox*, *supra*, 35 Cal.4th at p. 808.)

### B. Analysis

The allegations of the second amended complaint do not support a claim of delayed discovery after October 1987. Parents became aware of the alleged *harm* in this case when Christopher was diagnosed with retinoblastoma and other birth defects in

25

October 1987. And this case involves something more than injury alone. Like the plaintiffs in *Miller*, *Jolly*, and *Norgart*, who all suspected a wrongful cause of their injuries shortly after the injury occurred, Parents suspected that Christopher's injuries were caused by chemical exposure in their workplace. The averments of the second amended complaint support the conclusion that they suspected both *wrongdoing* and the alleged *cause* of Christopher's injuries shortly after the diagnosis when they went to NSC and asked "whether they had worked with or otherwise been exposed to any hazardous chemicals." The use of the word "hazardous" supports the conclusion that Parents suspected something in their work environment was dangerous to human health; not simply a cause, but a wrongful cause. At that point, they were "required to conduct a reasonable investigation of all potential causes of that injury" and were "charged with knowledge of the information that would have been revealed by such an investigation." (*Fox*, *supra*, 35 Cal.4th at p. 808.) In other words, Parents' actual suspicion of wrongdoing by their employer put them on inquiry notice for purposes of a statute of limitations analysis.

Since Parents suspected both wrongdoing and the alleged cause of Christopher's injuries in October 1987, Plaintiffs were required to plead that "despite diligent investigation of the circumstances of the injury, [Parents] could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period." (*Fox*, *supra*, 35 Cal.4th at pp. 808-809.) In this regard, Plaintiffs allege that Parents spoke to Christopher's doctors throughout his care and treatment, and that the doctors never informed them that parental occupational exposure may have caused his injuries. But Parents do not allege that they ever discussed with Christopher's doctors their suspicion that Christopher's condition was caused by parental occupational exposure to toxic chemicals. Nor do they allege that the causal connection between Parents' workplace exposure to hazardous chemicals and Christopher's injuries was not known by October 1993 when the limitations period ran (within six years after

26

Christopher was diagnosed), or that it was discovered later than October 1993 based on new scientific information. They do not allege that there were any new scientific studies or medical information that exposed the alleged causal link between their workplace exposure and Christopher's injuries that were unavailable to them during the limitations period or any time before December 2008. And Plaintiffs have not pleaded that a reasonable investigation between 1987 and 1993 would not have revealed a factual basis for their claim.

Furthermore, the allegations of Plaintiffs' proposed third amended complaint belie their contention that they could not have discovered the cause of Christopher's injuries before December 2008. According to that pleading, which is part of the record in this appeal, before 1982, SIA told NSC that animal studies had revealed that the chemicals used in the semiconductor industry caused birth defects. And before 1987, a SESHA journal article stated that at least 15 chemicals used to manufacture semiconductors were known to cause birth defects in humans, at least 18 such chemicals were known to cause birth defect in animals, employers like NSC should use caution with these chemicals, and employers should discuss potential reproductive harm with their female employees. The proposed third amended complaint also alleged that, "by at least 1987," there were "multiple . . . studies involving the reproductive effects of manufacturing chemicals, the results of which were summarized in detail and distributed by the Semiconductor Safety Association." The proposed amended complaint does not allege that despite a diligent investigation, Plaintiffs (or their attorneys or Christopher's doctors) would not have been able to discover these materials before October 1993 (within six years of Christopher's diagnosis).

We also examine whether Plaintiffs have rebutted the presumption that they had knowledge of the alleged wrongful cause of Christopher's injuries, applying the two-pronged test from *Fox*, which requires a plaintiff whose complaint shows on its face that the claim would be barred without the benefit of the discovery rule to " 'specifically

27

plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence.' " (*Fox*, *supra*, 35 Cal.4th at p. 808.) As we have noted, this "places the burden on the plaintiff to 'show diligence'; 'conclusory allegations will not withstand demurrer.' " (*Ibid.*) Plaintiffs contend they have pleaded adequate facts that satisfy both prongs of this test.

"The first prong requires plaintiffs to allege 'facts showing the time and surrounding circumstances of the discovery of the cause of action upon which they rely.' [Citation.] 'The purpose of this requirement is to afford the court a means of determining whether or not the discovery of the asserted [harm] was made within the time alleged, that is, whether plaintiffs actually learned something they did not know before.' " (*E-Fab*, *supra*, 153 Cal.App.4th 1308, 1324, quoting *Bennett v. Hibernia Bank* (1956) 47 Cal.2d 540, 563.)

Plaintiffs contend they have adequately pleaded time and manner of discovery because the second amended complaint alleges that in December 2008, Parents heard radio advertisements that certain attorneys were investigating cases of birth defects caused by chemical exposures in the semiconductor industry; that Parents responded to the advertisements and retained counsel who began investigating whether Christopher's retinoblastoma and birth defects were caused by parental chemical exposure at NSC; and that through this investigation they learned for the first time that Christopher's injuries were caused by harmful chemical exposures at NSC. Plaintiffs further allege that at no time prior to retaining counsel did Parents suspect that Christopher's injuries could be caused by parental or *in utero* exposure to toxic chemicals at NSC and that they "did not discover," "nor through the exercise of reasonable diligence could [they] have discovered," these facts "earlier than December 2008."

We will disregard Plaintiffs' conclusory allegations that Parents did not suspect wrongdoing before December 2008 because these allegations conflict with the allegations that in October 1987 they asked NSC whether they had worked with or otherwise been

exposed to hazardous chemicals. When a complaint contains both general allegations and specific allegations and a conflict or inconsistency exists between those allegations, the specific allegations control over inconsistent general allegations. "Under this principle, it is possible that specific allegations will render a complaint defective when the general allegations, standing alone, might have been sufficient." (*Perez v. Golden Eagle Transit Dist.* (2012) 209 Cal.App.4th 1228, 1235-1236 citing *Skopp v. Weaver* (1976) 16 Cal.3d 432, 437.) Here, the specific allegations that support the conclusion that Parents actually suspected wrongdoing and were on inquiry notice in October 1987 control over the general allegation that Parents did not suspect wrongdoing until they saw the attorney advertisements in 2008.

Even if we consider the allegations that Plaintiffs did not discover their causes of action until December 2008, they are still insufficient to satisfy the "time and manner of discovery" prong of *Fox*. Plaintiffs argue otherwise, relying on this court's opinion in *E-Fab*, *supra*, 153 Cal.App.4th 1308. The plaintiff in *E-Fab*, a corporation, sued an employment agency for negligence, breach of contract, and negligent misrepresentation after Vickie Hunt (an employee referred by the agency) embezzled money from the plaintiff between 1996 and 2003. (*Id.* at pp. 1313-1315.) In support of delayed accrual under the discovery rule, the "plaintiff allege[d] that it 'did not become aware of, nor did it have any reason to suspect, that Vickie Hunt had prior convictions for theft and welfare fraud and that her academic credentials had not been verified until after her embezzlement became known in November 2003 when Plaintiff was first informed of . . . Hunt's criminal record by the police. It was at that time that Plaintiff first became aware that . . . Hunt had not been "screened" by [defendant] and that [defendant's] representations as to her background were false.' " (*Id.* at 1324.) "Given the specificity of the foregoing allegations, [this court] conclude[d] that the factual circumstances of plaintiff's discovery of defendant's wrongdoing [were] sufficiently asserted to meet [the] first pleading requirement of the delayed discovery rule." (*Ibid.*) The court bolstered its

29

conclusion by comparing the averments of the complaint in *E-Fab* with "the insufficient pleadings found in other cases" and observed that the plaintiff's allegations in *E-Fab* showed "that it 'actually learned something [it] did not know before.' " (*Id.* at pp. 1324-1325.)

In contrast, as this court noted in *E-Fab*, the pleading in *McKelvey v. Boeing North American, Inc*. (1999) 74 Cal.App.4th 151 (superseded by statute on another ground as stated in *Grisham*, *supra*, 40 Cal.4th at page 637) was insufficient because it failed to "disclose the time or manner of discovery by any plaintiff" and offered "only conclusory allegations of [defendant's] 'massive cover-up,' and allegations that plaintiffs discovered that they 'may have sustained injuries as a result of [defendant's] wrongs "less than one year prior to filing [suit]." ' Before that time, they say (without elaboration), they did not suspect any wrongdoing." (*E-Fab*, *supra*, 153 Cal.App.4th at p. 1325 citing *McKelvey*, at pp. 160-161, fn. omitted.) The complaint in *Unpingco v. Hong Kong Macau Corp*. (1991) 935 F.2d 1043 was also insufficient. The plaintiffs in that case claimed they did not discover the facts constituting the fraud until 1988, but failed to explain what it was that they discovered in 1988 that finally put them on notice of the alleged fraud. (*E-Fab*, at p. 1325, citing *Unpingco*, at p. 1046.)

Although Plaintiffs here allege that they did not discover Christopher's claims until after they heard attorney advertisements in December 2008, and after they consulted with attorneys who conducted an investigation and determined that Plaintiffs had claims, they do not allege what facts their attorneys uncovered. Thus, we have no way of assessing whether those facts were different from or added anything new to Parents' suspicion in October 1987 that Christopher's injuries were caused by their exposure to hazardous substances at NSC or whether those facts would have been disclosed by a reasonable investigation after October 1987. Since the second amended complaint does not address this point, we conclude that Plaintiffs have not adequately pleaded time and manner of discovery of the wrongful conduct that caused their injuries. Therefore, it is

30

not necessary to determine whether the allegations of the second amended complaint are sufficient to meet the second pleading requirement of the discovery rule (inability to have made an earlier discovery). Because Plaintiffs cannot meet the two-pronged test under *Fox*, we hold that they have inadequately pleaded delayed discovery of Christopher's claims.

If indeed Christopher's retinoblastoma and other birth defects were caused by parental exposure to hazardous chemicals at work, we are sympathetic to Plaintiffs' desire for a remedy for NSC's alleged wrongful conduct. But we must apply the statutory limitations periods in accordance with the common law discovery rule.

### IV. *Timeliness of Debbie's Claims*

Plaintiffs contend the trial court erred when it sustained NSC's demurrer to Debbie's claims for negligent and intentional infliction of emotional distress on the ground that they were barred by the two-year statute of limitations for personal injuries in section 335.1. Although the trial court's order did not mention section 335.1 or Debbie's separate claims, the court sustained NSC's demurrer to Debbie's causes of action, which was based on section 335.1, without leave to amend. We shall therefore address this contention. Plaintiffs argue that their "analysis regarding the delayed accrual of Christopher's cause of action under the discovery rule applies with equal force to the accrual of [Debbie's] individual cause[s] of action, as her claims for emotional distress are premised on the same acts and omissions by Defendant NSC that resulted in Christopher's injuries."

Claims for negligent and intentional infliction of emotional distress are subject to the general personal injury statute of limitations. (*Roman v. County of Los Angeles* (2000) 85 Cal.App.4th 316, 323 [applying one-year statute of limitations in former section 340, subd. (3)].) Debbie's claims are based on (1) alleged acts or omissions by NSC while Debbie worked for the company, and (2) alleged misrepresentations regarding

31

her exposure to workplace chemicals in October 1987.  The second amended complaint alleges Debbie last worked for NSC in 1987.  The personal injury statute of limitations in effect in 1987 was former section 340, subdivision (3), which provided that the limitations period for an action for "injury . . . caused by the wrongful act or neglect of another" was one year.  Assuming Debbie's claims accrued in October 1987, when she asked NSC about her exposure to hazardous chemicals, or on December 31, 1987, the day she last worked for NSC,[7] she was required to file her complaint no later than December 31, 1988.

The limitations period for personal injury claims was enlarged to two years by the enactment of section 335.1, which became effective on January 1, 2003.  (*Andonagui*, *supra*, 128 Ca1.App.4th at p. 440.)  With one exception not relevant here, section 335.1 does not apply retroactively to revive claims that were already time-barred when it became effective on January 1, 2003.  (*Ibid.*)  Thus, to obtain the benefit of the longer limitations period of section 335.1, Debbie's claims must not have been time-barred as of January 1, 2003.  (*Ibid.*)  But as we have already stated, assuming her causes of action accrued no later than December 31, 1987, they were time barred as of December 31, 1988, long before the two-year limitations period in section 335.1 went into effect.  The only manner in which Debbie's claims could be subject to the two-year limitations period in section 335.1 is if the accrual of her claims was delayed until December 2008 under the discovery rule.  But we have already concluded that the complaint does not state sufficient facts to permit Christopher to rely on delayed accrual of his causes of action until December 2008 under the discovery rule.  Debbie does not allege any different facts from those that Christopher relies on to support delayed accrual of her causes of action.  Therefore, we conclude that Debbie, like Christopher, has not pleaded sufficient facts to

---

[7] Since the second amended complaint alleges only the year and not the specific date that Debbie last worked for NSC, we assume she worked there until the last day of 1987.

support application of the discovery rule in her case, and we hold that her claims for negligent and intentional infliction of emotional distress are time-barred.

## V.   *Leave to Amend*

Plaintiffs argue that if this court finds the allegations of their second amended complaint insufficient to demonstrate timeliness under the discovery rule, they should be granted leave to amend.

We review the denial of leave to amend after the sustaining of a demurrer under an abuse of discretion standard.  (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 (*Schifando*).)  "If we see a reasonable possibility that the plaintiff could cure the defect by amendment, then we conclude that the trial court abused its discretion in denying leave to amend.  If we determine otherwise, then we conclude it did not." (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320, citing *Schifando*, at p. 1081.)  The plaintiff has the burden of proving that an amendment would cure the defect.  (*Ibid*.)  Furthermore, "[i]f the plaintiff has not had an opportunity to amend the complaint in response to the demurrer, leave to amend is liberally allowed as a matter of fairness, unless the complaint shows on its face that it is incapable of amendment.  [Citations.]"  (*City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 747 ["second amended complaint does not on its face foreclose any reasonable possibility of amendment"].)

Plaintiffs argue that if we find the allegations of the second amended complaint insufficient under the discovery rule, they can cure the deficiency by alleging "that beginning shortly after his birth and continuing thereafter, Christopher received medical treatment, including surgery, for his retinoblastoma from Dr. Peter Egbert at Stanford Hospital; . . . ; that in response to their questions, Dr. Egbert informed [Parents] that retinoblastoma was caused by 'spontaneous mutation'; and that he never told or suggested to them that retinoblastoma could be caused by or was associated with parental

33

or *in utero* exposure to chemicals or chemical processes." While these allegations add detail regarding the identity of Christopher's doctor and what he told Parents, they do not add to previous allegations that the doctors never told Parents that Christopher's injuries were related to their workplace exposure. Like previous complaints, the proposed amendment does not say whether Parents discussed their suspicions regarding workplace exposure with Dr. Egbert, nor does it disclose when the doctor last discussed causation with them.

Regarding the alleged fraudulent concealment by NSC, Plaintiffs propose amending their complaint to allege "that before, during and after [Parents'] employment with Defendant NSC, NSC was aware of reproductive health hazards associated with chemicals and chemical formulations made and utilized at its manufacturing facilities, including in 'clean rooms' at its Santa Clara facility where [Parents] worked; that NSC concealed and failed to inform its prospective, current and former employees and the general public, including [the] Studendorffs, of the reproductive health hazards of these chemicals and chemical formulations, whose constituents were known to NSC, but not its employees; and that NSC's concealment and non-disclosure of these matters directly contributed to the ignorance of [Parents], Christopher, and his doctors regarding the connection between the above described exposures and his grave birth defects and injuries." These proposed amendments do not allege who concealed information, or what, if anything, was said to allay Parents' suspicion that hazardous chemicals at NSC caused Christopher's injuries. The proposed amendments are as conclusory as the allegations of the second amended complaint and are insufficient to support a claim of fraudulent concealment. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645 ["fraud must be pled specifically; general and conclusory allegations do not suffice"].)

The proposed amendments do not state what new information Plaintiffs' attorneys provided after December 2008 that was different from what Parents suspected in October 1987 or explain why they could not have discovered that information before December

34

2008. Because plaintiffs have not demonstrated that they could cure the defects in their second amended complaint by amendment, even though the trial court gave them ample opportunity to do so, we conclude that the trial court did not abuse its discretion in denying leave to amend.

## VI. *Equitable Estoppel*

Acknowledging that they did not raise this issue in the trial court, Plaintiffs argue that NSC is equitably estopped from relying on the statute of limitations defense because NSC knew the chemicals used in its facility were hazardous and could cause severe harm to unborn children. Plaintiffs contend: (1) the second amended complaint contains sufficient facts to plead equitable estoppel; (2) their failure to raise this theory in the trial court does not preclude them from asserting it on appeal; and (3) if we conclude the allegations of the second amended complaint are insufficient to plead estoppel, they can amend their complaint to cure any deficiency.

NSC responds that Plaintiffs have waived any reliance on equitable estoppel by failing to raise this theory in the trial court. They also assert that the allegations of the second amended complaint do not support application of the doctrine of equitable estoppel because Plaintiffs do not allege "a misrepresentation bearing on the *necessity* of bringing a timely suit" and NSC's "mere denial of *legal liability* does not set up an estoppel." (Italics original.)

### A. Waiver

NSC relies on *Green v. Travelers Indemnity Co.* (1986) 185 Cal.App.3d 544 (*Green*), which reviewed a judgment of dismissal after demurrer. The appellate court in *Green* held that the plaintiffs had waived their estoppel claim because they "failed to plead the theory of estoppel and failed to argue that doctrine in the court below, despite the fact that they were allowed to amend their complaint and did, in fact, advance lengthy

arguments in opposition to respondents' demurrers." (*Id.* at p. 555.) The court explained, "It is, . . . , well settled that a party who has an opportunity to plead estoppel on which his cause of action or defense is premised must do so, and that an eventual failure to so plead constitutes a waiver of estoppel. [Citations.] It is likewise settled (1) 'that a party to an action may not, for the first time on appeal, change the theory of the cause of action' and (2) 'that issues not raised in the trial court cannot be raised for the first time on appeal.' [Citation.] The latter rule especially applies to the doctrine of estoppel which constitutes factual elements which must be both pled and proved in the trial court. [Citations.]" (*Ibid.*) The *Green* court offered two other reasons for its holding, including that the plaintiffs had not and could not allege facts that would support their estoppel claim. (*Id.* at pp. 555-556.)

Like the plaintiffs in *Green*, Plaintiffs were allowed to amend their complaint twice and had two opportunities to present argument in opposition to NSC's demurrers. But unlike the plaintiffs in *Green*, Plaintiffs' estoppel claim relies on facts already pleaded in their second amended complaint. And some of the reasoning NSC relies on from *Green* is contrary to this court's holding in *Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* ( 2009) 171 Cal.App.4th 1356 (*Alfaro*). *Alfaro* stated: " 'An appellate court may . . . consider new theories on appeal from the sustaining of a demurrer to challenge or justify the ruling. As a general rule a party is not permitted to change its position on appeal and raise new issues not presented in the trial court. [Citation.] This is particularly true "when the new theory depends on controverted factual questions whose relevance thereto was not made to appear" in the trial court. [Citation.] However, "a litigant may raise for the first time on appeal a pure question of law which is presented by undisputed facts." [Citations.] A demurrer is directed to the face of a complaint (. . . § 430.30, subd. (a)) and it raises only questions of law (. . . § 589, subd. (a); [citation]). Thus an appellant challenging the sustaining of a general demurrer may change his or her theory on appeal [citation], and an appellate

36

court can affirm or reverse the ruling on new grounds. [Citations.] After all, we review the validity of the ruling and not the reasons given. [Citation.]' " (*Alfaro*, at pp. 1396-1397, quoting *B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 959.)

In light of *Alfaro*, since Plaintiffs' equitable estoppel argument relies on facts already contained in their pleading, we conclude that they have not waived or forfeited the contention that their second amended complaint sufficiently pleads that NSC is equitably estopped from relying on the statute of limitations. We turn to the merits of that argument.

## B. The Allegations of the Complaint are Insufficient to Support an Equitable Estoppel Claim

"Equitable tolling and equitable estoppel are distinct doctrines. ' "Tolling, strictly speaking, is concerned with the point at which the limitations period begins to run and with the circumstances in which the running of the limitations period may be suspended. . . . Equitable estoppel, however, . . . comes into play only after the limitations period has run and addresses . . . the circumstances in which a party will be estopped from asserting the statute of limitations as a defense to an admittedly untimely action because his conduct has induced another into forbearing suit within the applicable limitations period. [Equitable estoppel] is wholly independent of the limitations period itself and takes its life . . . from the equitable principle that no man [may] profit from his own wrongdoing in a court of justice." ' [Citation.]" (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 383 (*Lantzy*).) "One aspect of equitable estoppel is codified in Evidence Code section 623, which provides that '[w]henever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it.' " (*Lantzy*, at p. 384.)

" 'A valid claim of equitable estoppel consists of the following elements:  (a) a representation or concealment of material facts (b) made with knowledge, actual or virtual, of the facts (c) to a party ignorant, actually and permissibly, of the truth (d) with the intention, actual or virtual, that the ignorant party act on it, and (e) that party was induced to act on it.'  [Citations.]" (*Transport Ins. Co. v. TIG Ins. Co*. (2012) 202 Cal.App.4th 984, 1013 (*Transport*).)  "The defendant's statement or conduct must amount to a misrepresentation bearing on the *necessity* of bringing a timely suit; the defendant's mere denial of *legal liability* does not set up an estoppel."  (*Lantzy*, *supra*, 31 Cal.4th at p. 384, fn. 18; original italics.)"

The California Supreme Court has clarified the latter rule in cases involving insurance claims.  The question in that context is whether the insurer's statement that the insured was not entitled to benefits under the policy was "an unconditional denial of liability that would start the running of the statute of limitations" or "a misrepresentation of fact on which the insured reasonably relied . . . that could furnish a basis for" an estoppel.  (*Vu v. Prudential Property & Casualty Ins. Co*. (2001) 26 Cal.4th 1142, 1149 (*Vu*), citing *Neff v. New York Life Ins. Co*. (1947) 30 Cal.2d 165.)  In *Vu*, an insurance adjuster told the insured (a victim of the Northridge earthquake) that he was not entitled to any benefits under his earthquake policy because the cost of repair was $3,962.50, considerably less than the policy's $30,000 deductible.  (*Vu*, at p. 1147.)  After the limitations period expired, the insured hired an appraiser who opined that his damages far exceeded his deductible.  The court concluded that the adjuster's statement was a misrepresentation of fact and that since the insurer "represented incorrectly" that Vu's loss was less that the policy's deductible, it was estopped from raising the one-year statute of limitations as a defense.  (*Id.* at pp. 1152-1154.)

In *Lantzy*, the Supreme Court addressed the adequacy of a complaint to plead equitable estoppel in a case alleging latent construction defects and concluded that the allegations in that case were insufficient to establish equitable estoppel.  The court stated,

"The complaint's sole allegation on this issue is 'that *at various times* Defendants have attempted to make repairs . . . or advised Plaintiffs that the defective windows were not defective and not to file a lawsuit,' but have not properly repaired the leaking windows and associated damage, and 'are [therefore] estopped to assert that Plaintiffs have not commenced this action in a timely fashion.' " (*Id.* at p. 385, original italics.) The court found this allegation insufficient because the complaint was "devoid of any indication that defendants' conduct *actually and reasonably induced plaintiffs to forbear suing within the 10-year period of section 337.15*. There is no suggestion that the repair attempts alleged, if successful, would have obviated the need for suit. Moreover, for all that appears, the 'various times' at which defendants' alleged conduct occurred were times well before the statute of limitations ran out, or even, as the trial court suggested, after it had expired. And there is no claim that the inadequacy of these repairs, or the falsity of defendants' alleged 'no defect' representations, remained hidden until after the limitations period had passed. Hence, plaintiffs have pled no facts indicating that defendants' conduct directly prevented them from filing their suit on time." (*Ibid.*, original italics.) The court also held there was "no reasonable possibility the deficiency [could] be remedied by credible amendment of the complaint." (*Id.* at pp. 386-388.)

Turning to the allegations in this case, we begin with the general rule "that estoppel must be specifically 'pleaded in the complaint with sufficient accuracy to disclose [the] facts relied upon.' " (*Transport*, *supra*, 202 Cal.App.4th at p. 1013.) Plaintiffs allege that around October 1987, Parents asked NSC "whether they had worked with or otherwise been exposed to any hazardous chemicals. Specifically, Debbie . . . contacted [NSC's] human resources department, which in turn referred her to other departments." They allege that in response to Debbie's question, NSC "actively concealed and by omission failed to provide information," and that it purported to respond "while in fact actively concealing, and failing and refusing to provide, any information regarding the nature or potential health hazards of the chemicals and

39

processes used in its manufacturing facilities or to admit that it was in possession of any knowledge or information regarding such hazards." Plaintiffs allege that NSC "expressly and impliedly represented to [them] . . . that the chemicals and substances present in their work areas and at their place of employment did not pose a hazard to [Parents] or their unborn children" and that Parents "reasonably relied upon such representations."

Unlike the specific allegations in *Vu*, these allegations are insufficient to support an estoppel to assert a statute of limitations defense. In *Vu*, the plaintiff described his interactions with a named claims adjuster who told the plaintiff he was not entitled to benefits under his insurance policy because his damages were worth a specific amount that was significantly less than his deductible. The plaintiff also alleged that the claims adjuster misrepresented the cost of repair and that the actual cost of repair far exceeded the deductible. (*Vu*, *supra*, 26 Cal.4th at p. 1147.) In contrast, Plaintiffs allege only that Parents asked whether they had been exposed to hazardous chemicals. The second amended complaint does not allege who Parents talked to (by name, title, or job description), that person's role at NSC and authority to speak for the company, or what specific questions Parents asked. Plaintiffs do not allege that they asked about a specific chemical or group of chemicals. Instead, they allege generally that Debbie asked about exposure to hazardous chemicals. The complaint does not say whether Parents asked if the workplace chemicals caused their son's retinoblastoma or his other unspecified birth defects. And they do not state what NSC's representatives said in response, what information NSC actively concealed, or what information NSC representatives failed to admit other than that there were hazardous chemicals in the workplace. Importantly, there is no allegation that anyone at NSC told Parents they did not have a claim, or that they should forbear from suing or acting on their suspicion and investigating their claims further. Like the complaint in *Lantzy*, NSC's alleged concealment occurred around October 1987, long before the six-year limitations period ran. And the complaint

40

contains only a conclusory allegation that Plaintiffs reasonably relied on the information provided by NSC representatives.

We conclude that Plaintiffs' non-specific allegations are too conclusory to support the inference that NSC made a misrepresentation of fact on which Parents reasonably relied that could furnish a basis for an estoppel. Therefore, we hold that the allegations of the complaint at most allege "a denial of *legal liability*" but do "not set up an estoppel." (*Lantzy*, *supra*, 31 Cal.4th at p. 384, fn. 18; original italics.)

### C. Leave to Amend to Allege Estoppel

Plaintiffs contend they can amend their complaint "to cure any deficiency" and request leave to do so. They argue that amendments could include that Parents "reasonably relied on . . . NSC's statements, made in response to their inquiry after Christopher's diagnosis, that the chemicals and processes at NSC's Santa Clara manufacturing facility were not hazardous to employees or their unborn children and were not the cause of Christopher's injuries. Additionally, they can allege that had they been told the truth by NSC, *i.e.*, that the chemicals and processes were reproductively toxic and could cause severe injury to unborn children, which NSC knew, they would have filed an action against NSC within the limitations period." (Original italics.)

These proposed amendments are as conclusory as the averments of the second amended complaint and do not cure the problems identified. In other words, they do not allege a "misrepresentation bearing on the *necessity* of bringing a timely suit." (*Lantzy*, *supra*, 31 Cal.4th at p. 384, fn. 18; original italics.) We therefore hold that Plaintiffs will not be granted leave to amend to plead that NSC is equitably estopped to rely on the statute of limitations.

### DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal.

_____

Márquez, J.

WE CONCUR:

_____

Bamattre-Manoukian, Acting P.J.

_____

Grover, J.